UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NICOLE TURNER,                                    13-CV-693-FPG-MJR

               Plaintiff,                       REPORT AND
                                      RECOMMENDATION
     v.

MARK PROCOPIO, et al.,

               Defendants.
_____

## INTRODUCTION

This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable Frank P. Geraci, for hearing and reporting on dispositive motions for consideration by the District Court. Before the Court are motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by defendants Rebecca Lynn Bjorck, Justine Waldman, Adanivia Feliciano, Jason Fifield, Angelique Heppner, Christopher Nunez, and Mark Procopio. Also before the Court are plaintiff Nicole Turner's motions for summary judgment against defendants Rebecca Lynn Bjorck, Justine Waldman, Adanivia Feliciano, Jason Fifield, and Mark Procopio. For the following reasons, it is recommended that defendants' motions be granted in their entirety and plaintiff's motions be denied in their entirety.

## PROCEDURAL HISTORY

The Court assumes familiarity among the parties with the case and its procedural history. Therefore, only the relevant history is outlined here. Plaintiff filed her initial complaint on July 1, 2013 (Dkt. No. 1), her First Amended Complaint on May 22, 2014

(Dkt. No. 5), and her Second Amended Complaint on August 5, 2015 (Dkt. No. 10). All parties and claims listed in the Second Amended Complaint ("SAC") have been dismissed except for those discussed in this Report and Recommendation.[1] Defendant Bjorck filed a motion for summary judgment on April 19, 2019. (Dkt. No. 105). Defendant Waldman filed a motion for summary judgment on April 19, 2019. (Dkt. No. 1070). Defendants Feliciano, Fifield, Heppner, Nunez, and Procopio together filed a motion for summary judgment on April 19, 2019. (Dkt. No. 109). On April 22, 2019, Plaintiff filed motions for summary judgment against Waldman and Bjorck (Dkt. No. 112), and against Feliciano, Fifield, and Procopio (Dkt. No. 113).

## RELEVANT FACTS AND BACKGROUND

Plaintiff Nicole Turner (a/k/a Nicole Hayes) ("plaintiff"), who is proceeding *pro se*, commenced this action under 42 U.S.C. § 1983 against various employees of the New York State Department of Corrections and Community Services ("DOCCS"), employees of the New York State Police ("NYSP"), and medical personnel privately employed by the Arnot Ogden Medical Center (collectively "defendants"). Plaintiff alleges that she was unlawfully searched and seized in violation of the Fourth Amendment and denied her due process rights in violation of the Fourteenth Amendment based upon events occurring on July 24, 2010 at Elmira Correctional Facility ("Elmira"), NYSP Horseheads Barracks ("Horsehead Barracks"), and Arnot Ogden Medical Center ("Arnot Ogden"). She asserts

---

[1] Defendants Bjorck and Waldman brought motions to dismiss all three claims against them. (Dkt. Nos. 28, 30). In his decision and order (Dkt. No. 43), U.S. District Judge Frank P. Geraci adopted this Court's Report and Recommendation (Dkt. No. 40) on those Motions to Dismiss and dismissed the False Arrest and Deliberate Indifference claims. This Report and Recommendation only deals then with the remaining Fourth Amendment Unlawful Search claims against them. In her summary judgment motion, plaintiff attempts to resurrect the Deliberate Indifference claim in her papers despite the District Court dismissing it with prejudice. Accordingly, this claim is not addressed in this Report and Recommendation.

that defendants subjected her to false arrest/unlawful detention, unconstitutional conditions of confinement, and to an unlawful search.

Defendants Adanivia Feliciano and Christopher Nunez, who are DOCCS employees, and Jason Fifield, Angelique Heppner, and Mark Procopio, who are NYSP employees, contend that they are entitled to summary judgment on the bases that plaintiff has failed to establish a violation of her constitutional rights, they had probable cause to arrest plaintiff, they are entitled to qualified immunity, and they are entitled to Eleventh Amendment immunity.

Defendants Rebecca Lynn Bjorck and Justine Waldman, M.D., who are medical personnel employed by Arnot Ogden Medical Center, contend that they are entitled to summary judgment on the bases that plaintiff has failed to establish a violation of her constitutional rights, they had no duty to intervene, and they are entitled to qualified immunity. Defendant Bjorck additionally contends that she was not personally involved in any of the alleged constitutional violations.

### Defendant's Declarations and Exhibits

On or about July 19, 2010, Adanivia Feliciano began an investigation into suspected illegal drug smuggling at Elmira Correctional Facility. (Dkt. No. 109-3, ¶ 5). At the time, Feliciano was a Senior Investigator employed by DOCCS in the Office of Special Investigations, Narcotics Unit. (*Id.* at ¶ 1). Her investigation was focused on inmate Alex Gonzalez and Gonzalez's girlfriend, Surin Rodriguez. (*Id.* at ¶ 5). The investigation revealed the possible involvement of inmate Ronald Hayes and the plaintiff, who was married to Hayes. (*Id.*) On or about July 23, 2010, Feliciano reviewed a monitored telephone call, which occurred on July 22, 2010, between the plaintiff and inmate Hayes.

(*Id.* at ¶ 6). During the call, plaintiff and inmate Hayes referenced a "$60 cab ride" several times. (*Id.*) Based on her experience and the ongoing investigation, Feliciano concluded that plaintiff and Hayes were using coded language to discuss the sale, transport, and smuggling of drugs between inmate Gonzalez, inmate Hayes, Ms. Rodriguez, and plaintiff. (*Id.*).

Christian Nunez, who was employed as Deputy Chief of the DOCCS Office of Special Investigations, was assigned to assist Feliciano in her investigation. (Dkt. No. 109-4, ¶ ¶ 1, 5). On July 24, 2010, Ms. Rodriguez was interviewed as a part of the ongoing investigation. (Dkt. No. 109-3, ¶ 7; 109-4, ¶ 6). Ms. Rodriguez admitted to and provided a sworn statement regarding the drug smuggling conspiracy referenced above. (Dkt. No. 109-8, Ex. B, Bates No. 31-32, 93-94). She identified plaintiff as a participant. (*Id.*). She stated that inmate Gonzalez and she had made arrangements with the wife of another inmate to pick up two bundles of heroin from Rodriguez so that the wife could smuggle them into Elmira. (*Id.*). She stated she delivered two bundles of heroin to that person on the Thursday prior to July 24, 2010. (*Id.*) Rodriguez identified the inmate's wife as "Nicky" and described the clothing she was wearing when Rodriguez saw her at the prison that morning. (*Id.*) The woman she described matched the description of plaintiff, who arrived at the facility to visit her husband, inmate Hayes. (*Id.*).

Plaintiff testified that she arrived at Elmira Correctional Facility at approximately 7:00 a.m. on July 24, 2010. (Dkt. 109, Ex. C, pg. 34-36). She had eaten breakfast before arriving at Elmira. (*Id.* at 39). Upon arrival, she used the restroom at the facility to relieve herself and to change her clothing, and was inside the facility's restroom for 30 to 45 minutes. (*Id.* at 38, 41). She changed into a black dress and black leggings before lining

4

up to be processed for visitor entry. (*Id.* at 37). Plaintiff was stopped and questioned by Nunez and Feliciano before entering. (*Id.*). Plaintiff was interviewed at Elmira from 9:30 a.m. until approximately 2:00 p.m. (Dkt. No. 109-8, Bates No. 29). She denied possessing any contraband and was hostile and uncooperative. (Dkt. No. 109-3, ¶ 8). Plaintiff was offered food and drink during the interview process. (Dkt. No. 109-4, ¶ 8). It is the policy of the Office of Special Investigations that in situations such at this, a detainee is permitted to use the bathroom as soon as operationally feasible, with the caveat that the water may be turned off and the toilet may be inspected to avoid destruction of evidentiary items. (Dkt. 109-3, ¶ 10). During the interview, plaintiff asked to use the restroom and Investigator Feliciano told her that she would have to wait. (*Id.* at ¶ 11). Plaintiff then urinated on herself, but she was not forced to clean it up. (*Id.*; Dkt. No. 109-4, ¶ 9). Nunez attests that he did not offer the plaintiff a trash can to urinate in lieu of a restroom, nor did he ridicule or threaten the plaintiff. (Dkt. No. 109-4, ¶¶ 16-17).

At approximately 12:10 p.m., the New York State Police was notified of the pending investigation. (Dkt. No. 109-7, Ex. A). Based on Feliciano's investigation and the sworn statement of Ms. Rodriguez, plaintiff was transferred to the custody of the State Police and transported to the Horseheads Barracks by Trooper Jason Fifield. (Dkt. No. 109-3, ¶ 12; 109-5, ¶ 4-5). At the barracks, NYSP Investigator Mark Procopio and Investigator Feliciano worked together to draft an application to obtain a search warrant. (*Id.* at ¶ 13; *id.* at 7). Plaintiff testified that she requested to use the restroom approximately one hour after arriving at the barracks, and that request was granted within fifteen minutes. (Dkt. No. 109-9, Ex. C, pgs. 86-87).

Based upon the sworn application of Feliciano, which included information from her investigation and the sworn statement of Ms. Rodriguez, a search warrant was issued by Elmira City Court Judge Steven Forrest. (Dkt. No. 109-8, Ex. B, Bates No. 4-11). The search warrant authorized and directed the following search of plaintiff:

> […] the search should be limited to an X-ray of the pelvic area and stomach area of Nicole Hayes and the body search and cavity search of the vaginal and rectal area of Nicole Hayes to retrieve any drugs or contraband from within.

(*Id.* at Bates No. 11). The warrant further directed that the search must be "conducted by a physician, nurse, or other qualified medical personnel in a hospital setting" between the hours of 6:00 a.m. and 9:00 p.m. (*Id.*)

Around 5:00 p.m., plaintiff complained of feeling sick and dizzy, and experiencing heart palpitations. (Dkt. No. 109-9, pg. 91). An ambulance was called to the barracks and plaintiff was transported by ambulance to the Arnot Ogden Medical Center in Elmira, New York. (*Id.* at 92). NYSP Trooper Angelique Heppner accompanied plaintiff on the ride to the hospital. (Dkt. 109-9, pg. 94).

Plaintiff arrived at Arnot Ogden hospital at 5:53 p.m. and was treated for her symptoms by Carl Werne, M.D. (Dkt. No. 105, Ex. A,; 109, Ex. D, Bates No. 247). Justine Waldman, M.D. was the attending physician in the emergency room that evening. (Dkt. No. 107-8, ¶ 9). She attested that she was employed by Arnot Ogden Medical Center, a not-for-profit corporation, and that she was not a state employee. (*Id.* at ¶¶ 6-7). Rebecca Lynn Bjorck (f/k/a Rebecca Lynn Burd) was employed as a nurse at Arnot Ogden. (Dkt. No. 105-2).

During plaintiff's treatment, at approximately 8:00 p.m., plaintiff was served with the search warrant by Investigator Procopio. (Dkt. No. 109-9, pgs. 98-99). Initially plaintiff

refused to comply with the warrant. (Dkt. No. 109-5, ¶ 10). Investigator Procopio made arrangements for her to meet with counsel. (*Id*.). Chemung County Public Defender Scott Fierro came to the hospital to consult with plaintiff. (*Id*.; 109-9, pg. 100). Plaintiff testified that although Mr. Fierro identified himself as a public defender and he informed her that he was there to try to help her, she still did not feel that he was there to act as her attorney. (Dkt. No. 109, pgs. 100-07). Nonetheless, plaintiff testified that she had an opportunity to speak with Mr. Fierro about what the warrant meant and the outcome of it prior to the search. (*Id*. at pg. 108). After speaking with Mr. Fierro, plaintiff "complied with" the warrant. (*Id*. at pgs. 106-07).

Officers presented Dr. Waldman with the warrant which she understood to be a "valid judicial search warrant […] authorizing and directing" her to search plaintiff. (Dkt. No. 107-8, ¶ 11). An x-ray was taken of plaintiff's abdomen. (Dkt. No. 105-4, pg. 27). An opaque foreign body was *not* observed on the x-ray. (*Id*.) Dr. Waldman then performed a manual search of plaintiff's vaginal and rectal cavities. (Dkt. No. 107-8. at ¶ 13; Dkt. No. 109-9, pg. 137; Dkt. No. 105-4, pg. 7). Nurse Bjorck was present in the room during the search, and plaintiff states that Bjorck told her, "you have to remove all your clothes in order to be searched." (Dkt. No. 146-6). Plaintiff disclosed a history of uterine fibroids to medical personnel at the time and testified that she was experiencing vaginal bleeding due to a new medication she was taking related to that condition. (Dkt. No. 105-4, pg. 15; 109-9 at pgs. 137-38).

The search revealed no drugs or other contraband and Plaintiff was released from custody immediately thereafter. (Dkt. Nos. 109-5 at 2; 109-9 at 102-03).

7

*Plaintiff's Complaint and Motions for Summary Judgment*

Each of the claims contained in plaintiff's second amended complaint arise out of the above-described events on July 24, 2010. Plaintiff alleges that defendants Feliciano and Nunez unlawfully detained her and subjected her to cruel and inhumane treatment at the Elmira Correctional Facility, the Horseheads Barracks, and the Arnot Ogden Medical Center; defendant Fifield unlawfully detained her and subjected her to cruel and inhumane treatment at the Horseheads Barracks; that defendant Procopio unlawfully detained her and subjected her to cruel and inhumane treatment her at the Horseheads Barracks and Arnot Ogden; and defendant Heppner unlawfully detained her and subjected her to cruel and inhumane treatment at Arnot Ogden. (Dkt. No. 10, pg. 12-13).

Plaintiff specifically alleges that her seizure, detention, and transfer to the New York State Police Barracks was not based on probable cause that she was involved in a drug smuggling conspiracy. (Dkt. No. 113, ¶ 32-42). Plaintiff makes several arguments as to why she believes officers lacked probable cause to stop and detain her. In sum, she submits that the inmate telephone conversations and the statement of Ms. Rodriguez were insufficient to establish probable cause. Citing the "fellow officer" doctrine, she also asserts that NYSP officers were not entitled to detain her at Elmira based on Feliciano's investigative findings.

Relating to the warrant application, plaintiff alleges that defendants Feliciano, Nunez, and Procopio failed to articulate a factual basis to believe plaintiff secreted drugs inside her body cavity; that defendants Feliciano and Procopio failed to test informant reliability and credibility; and that defendants Feliciano and Procopio omitted material facts to obtain the search warrant. (Dkt. No. 10, pg. 12; 113, ¶ 54-73). She asserts that

inmate Gonzalez never stated the name of the alleged smuggler when speaking over the telephone with Ms. Rodriguez, and thus it was unreasonable to identify that person as plaintiff. Further, plaintiff argues that her name was never mentioned by her husband, inmate Hayes, in his telephone conversations. Plaintiff also challenges the inclusion in the warrant of two telephone numbers in the warrant application without disclosure that neither telephone number belonged to plaintiff. The first telephone number was given by inmate Gonzalez to Ms. Rodriguez in order to reach their alleged co-conspirator, and the second was the number involved in a listened-to call between inmate Hayes and a co-conspirator alleged to be plaintiff. Plaintiff also argues that defendants could not have known plaintiff was the wife of inmate Hayes at the time she visited Elmira because she registered under the name "Nicole Turner" and listed herself as a "friend" of inmate Hayes.

Plaintiff asserts that defendant Procopio, Nunez, and Feliciano failed to follow DOCCS policies and procedures by not releasing her from Elmira upon her request. (Dkt. No. 10, pg. 12; 113, ¶¶ 44-53). Specifically, plaintiff claims that the officers violated her constitutional rights by failing to follow DOCCS policies and New York State regulations set out in 7 NYCRR § 200.2. The referenced regulation relates to searches of prison facility visitors and provides that any visitor has the option to refuse to comply with search procedures, albeit with resulting denial of entry. Plaintiff claims that she should have been given the opportunity to refuse a search and depart without entry to the facility.

Plaintiff also alleges that defendants Nunez and Feliciano subjected her to unconstitutional conditions of confinement by failing to provide food, water, and use of a restroom, and by yelling at and ridiculing her during her detention at Elmira. (Dkt. No. 10, pgs. 12-13; 113, ¶ 34). She claims that the room she was held in at Elmira was too warm

and did not have ventilation. She also claims that she asked to use the restroom approximately ten times, but that Investigator Feliciano denied her requests. She states that Investigator Feliciano pushed a garbage can over to her and told her to "do what animals do." As a result, plaintiff urinated on herself and claims that Nunez told her to clean up the mess. She asserts that she asked to leave several times. She also alleges that she repeatedly asked for something to eat or drink but was denied the request.

Plaintiff claims that defendants Waldman and Bjorck performed an invasive and illegal body cavity search by carrying out an invalid warrant. (Dkt. No. 112, ¶¶ 16-21). She claims that they exceeded the scope of the warrant by performing a manual search, instead of a visual inspection. (*Id.* at ¶¶22-25). She contends that defendants were not authorized to manually retrieve any contraband without first obtaining positive x-ray results confirming the presence of a foreign item. (*Id.* at ¶¶ 26-35) Plaintiff additionally claims that the x-ray and body cavity search were unreasonable and exacerbated pre-existing medical conditions, causing her to undergo a hysterectomy in August 2010. (*Id.* at ¶¶ 36-37; Dkt. No. 109-9, pg. 115.)

Lastly, Plaintiff alleges that defendants Feliciano and Procopio acted unreasonably in requesting an x-ray and body cavity search of a person with uterine fibroids, and by directing the vaginal and rectal cavity search on plaintiff after an x-ray was negative for foreign objects. (Dkt. No. 113 at ¶ 90-91).

## **DISCUSSION**

### *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011).

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 2016 U.S. App. LEXIS 1650 (2d Cir. 2016); *quoting Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). Where a plaintiff is proceeding *pro se*, the court must "construe the complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). However, even a *pro se* litigant cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002).

## I.    Plaintiff's Fourth Amendment Claims

To sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must prove that conduct by a person acting under the color of state law deprived him of a right guaranteed by the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

### 1. *False Arrest / Unlawful Detention Claims*

Plaintiff alleges that defendants Feliciano, Nunez, Fifield, Heppner, and Procopio illegally seized and detained her at Elmira Correctional Facility, NYSP Horseheads Barracks, and Arnot Ogden Medical Center on July 24, 2010. A claim for false arrest, pursuant to Section 1983, derives from an individual's right to remain free from unreasonable seizures, including the right to be free from arrest absent probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either: (1) he had probable cause for the arrest; or (2) he is protected from liability because of qualified immunity. *See Simpson v. City of New York*, 793 F.3d 259 (2d Cir. 2015). An arresting officer has probable cause when the officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *See Weyant*, 101 F.3d at 852. When determining whether probable cause existed to support an arrest, courts are to "consider those facts available to the officer at the time of the arrest and immediately before it" and must render a decision based upon "the totality of the circumstances." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). Further, the elements of a false arrest claim under Section 1983 are substantially the same as the elements of false arrest and false imprisonment claims under New York state law. *See*

*Weyant*, 101 F.3d at 852; *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007) (Similar to a Section 1983 claim, under New York state law, an officer is not liable for false arrest "if, applying the reasonable, prudent person test, the arresting officer, acting in good faith, had reasonable cause for believing the person to be arrested to have a committed [a crime].").

Here, defendants contend that they had probable cause to arrest and detain plaintiff for committing, or attempting to commit, crimes associated with the sale, transport, and smuggling of drugs into Elmira. There is no material issue of fact as to whether the officers had sufficient evidence to detain and arrest plaintiff for the suspected crime. *See United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) ("The quantum of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction). On or about July 19, 2010, Investigator Feliciano began looking into drug smuggling activity at Elmira between inmate Gonzalez and Ms. Rodriguez. That investigation revealed the possible involvement of inmate Hayes and his wife, the plaintiff herein. Feliciano's inquiry included the review of a monitored telephone call which occurred on July 22, 2010 between plaintiff and inmate Hayes in which those parties discussed a "$60 cab ride." Feliciano's law enforcement experience and the circumstances of his investigation into this illegal activity, led him to conclude that Hayes and plaintiff were using coded language to refer to illegal drug activity. Further, defendants relied on the sworn statement of suspected co-conspirator, Ms. Rodriguez, who identified plaintiff as a participant in the smuggling operation. Ms. Rodriguez attested that she had delivered heroin to plaintiff on the Thursday prior to this incident. She physically identified plaintiff and gave a description of her clothing after seeing plaintiff

waiting outside Elmira on the morning of July 24, 2010. Plaintiff questions the validity and reliability of Ms. Rodriguez's statement, but officers were justified in relying on her as a "reasonably believable" witness. *See Spiegel v. Cortese*, 196 F.3d 717, 723-24 (7th Cir. 1999); *Manzella v. Vill. of Bridgeview*, 2004 U.S. Dist. LEXIS 15450, *12 (N.D. Ill. 2004) (*citing Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003) ("The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest and in crediting the complaint of a reasonably believable witness, the police are under no constitutional obligation to exclude all suggestions that the witness is not telling the truth.")

Plaintiff's argument that the "fellow officer" rule did not apply to defendant Feliciano is without merit. The "fellow officer" rule or collective knowledge doctrine provides that an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials. *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (citing *Whitely v. Warden*, 401 U.S. 560, 568 (1971); s*ee also Johnson v. State*, 660 So. 2d 648, 657 (Fla. 1995) ("[I]nformation shared by officers investigating a crime is imputed to any one of their number, even those from different agencies working together.") Correction officers of any state correctional facility are persons designated as peace officers with the power to make arrests and carry out warrantless searches when constitutionally permissible. *See* NY CLS CPL §§ 2.10; 2.20. Accordingly, NYSP Investigator Procopio was entitled to rely on the reasonable investigative information learned from DOCCS Investigator Feliciano as a fellow officer under the laws of the State of New York. Feliciano's investigation established probable

cause to arrest plaintiff, and Procopio, Fifield, and Heppner properly detained plaintiff based upon that imputed knowledge.

Based upon the totality of the circumstances, the Court finds that probable cause existed for a reasonably prudent officer to suspect that plaintiff had committed or was attempting to commit a crime related to illegal narcotics trafficking and smuggling. Thus, no reasonable jury could conclude that plaintiff was subject to false arrest or unlawful detention.

   2. *Challenges to Search Warrant*

Plaintiff alleges that the search warrant issued by Elmira City Court Judge Steven Forrest was not supported by probable cause because defendants Procopio and Feliciano used false information and omitted material facts to obtain it. Upon a challenge to a probable cause finding made in a search warrant, a reviewing court must give deference to the issuing judge. *Illinois v. Gates*, 462 U.S. 213, 236 (1969). The court is not to conduct a *de novo* review nor is it to "interpret[] affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.* Instead, the role of a reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238 (internal citations omitted). To that end, warrant affidavits are entitled to "a presumption of validity." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The Supreme Court has held that a criminal defendant is entitled to an evidentiary hearing with respect to the validity of a search warrant only if they can make a substantial preliminary showing that: (1) the warrant affidavit contained a false statement; (2) the false statement was included intentionally or recklessly; and (3) the false statement was integral to the probable cause finding. 438 U.S. at 155-56. A Section 1983 plaintiff

challenging a warrant on this basis must make the same showing that is required at a suppression hearing under *Franks*. *See Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994).

No such showing has been made here. The Second Circuit has held that "[i]f, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). A search warrant issued by an impartial magistrate is presumptively valid. *See United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993). Where, as here, the Court is reviewing the probable cause determination of an independent magistrate, it asks solely "whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). Doubts regarding the existence of probable cause should be resolved in favor of upholding the search warrant. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Probable cause does not require proof of guilt beyond a reasonable doubt, but only an objectively reasonable basis for believing that evidence of the crime can likely be found at the described locus at the time of the search. *Jordan v. Town of Waldoboro*, 943 F.3d 532, 542 (1st Cir. 2019) (citations and internal quotations omitted) (reviewing probable cause for a search warrant challenged in a § 1983 action). Applying this standard of review to the warrant application, the Court finds that probable cause existed for the warrant.

Plaintiff has not shown that the alleged errors, misrepresentations, or omissions, if any, in the search warrant application were material to the probable cause determination. Although plaintiff challenges, and Feliciano concedes, that the telephone numbers referenced in the warrant application are registered with DOCCS to persons other than

plaintiff, the record reflects that plaintiff had access to and used both numbers regularly. (*See* Dkt. No. 111-1; 111-2). The record is also clear that Feliciano reasonably believed the female on the call to be plaintiff, in that over the course of several telephone calls to the same number the plaintiff and inmate Hayes identified themselves. (*Id.*). The omission of the names registered to the telephone numbers is not a material omission in light of the investigative findings that plaintiff was speaking on and involved with the incriminating calls. Plaintiff also challenges that neither she nor her husband, inmate Hayes, were identified by name in Ms. Rodriguez's statement. This argument is without merit because Ms. Rodriguez provided a telephone number that was registered to Hayes and referred to the individual as "Ja," which the parties do not dispute was a nickname used by Hayes. (*See* Dkt. No. 109-9, pgs. 33-34). Further, Ms. Rodriguez identified the other individual by the name "Nicky," a common abbreviation for "Nicole." Plaintiff also challenges her identification at the facility because of her registration under the name "Nicole Turner" and as a "friend." The fact that plaintiff used her maiden surname and did not list herself as "wife" or "spouse" of inmate Hayes on the visitor log is irrelevant to the establishment of her identity by investigators.

Plaintiff has not presented any evidence that the defendants knowingly or intentionally misled the court to issue the search warrant. Further, if the search warrant affidavit were amended to include the additional information relating to nicknames, identification procedures, and telephone numbers, the finding of probable cause would not be altered. Even a corrected affidavit supports an objective finding of probable cause. *See Soares v. Connecticut*, 8 F.3d 917, 920 (2d Cir. 1993). Accordingly, plaintiff's challenge to the constitutionality of the search warrant fails.

3. _Body Cavity Search_

Equally unavailing are plaintiff's claims that her constitutional rights were violated because the body cavity search exceeded the scope of the warrant. Plaintiff asserts that defendants Waldman and Bjorck performed an illegal manual cavity search because the warrant they were presented with was facially invalid. She states first that the search warrant failed to specify the type of body cavity search to be conducted., i.e. visual search or manual search. Second, she maintains that because the warrant was unclear the defendants acted unreasonably in proceeding with the cavity search after an x-ray of her abdomen showed negative results.

The search warrant presented to Dr. Waldman and Nurse Bjorck was not facially defective and execution of the search by medical personnel based upon the warrant was reasonable. The warrant was signed by a judge, specified the search to be conducted, and stated the type of evidence sought. Plaintiff cites various case law stressing the high level of government intrusion inherent to a body search, but most of the precedent cited is inapposite and applicable to warrantless searches. Here, the task of balancing the degree of intrusion versus criminal justice interests was already undertaken by the magistrate issuing the warrant. Even though the warrant did not explicitly state whether the search was to be limited to visual inspection or extend to physical examination, the requirement that the search be conducted "by a physician, nurse, or other qualified medical personnel in a hospital setting" anticipates a manual or physical probe. _See Rodriques v. Furtado_, 950 F.2d 805, 811 (1st Cir. 1991). Plaintiff provides no binding precedent to the contrary.

Plaintiff's claim that the search should have been dependent on positive x-ray results is contradicted by the plain language of warrant which states, "the search should be limited to an X-ray of the pelvic area and stomach area of Nicole Hayes **and** the body search and cavity search of the vaginal and rectal area of Nicole Hayes to retrieve any drugs or contraband from within." (Dkt. No. 109-8, Bates No. 4-11; 112, Ex. D) (emphasis added). The warrant mandated both an x-ray and a body cavity search; neither was contingent upon the findings of the other. A "negative" x-ray does not prove that a subsequent cavity search should not have been performed. *See Davila v. Teeling*, 2018 U.S. Dist. LEXIS 163683, *16-17 (E.D. Wis. Sep. 25, 2018) ("the overarching problem for Plaintiff is that the search warrant demanded both an x-ray and a body cavity search.").

The Court finds that the search warrant was not facially invalid on these grounds, and that the x-ray and manual body cavity search executed by defendants did not exceed the scope of the warrant.

### a. Nurse Bjorck's Personal Involvement

As to the remaining claim against Nurse Bjorck, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). In a false arrest context, each individual must have been personally involved in the arrest in order to be held liable. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). The Second Circuit has defined personal involvement as direct participation, or indirect participation, such as "ordering or helping others to do the unlawful acts." *Gaston v. Coughlin*, 249 F.3d 156, 165-66 (2d Cir. 2001); *see also Alicea v. City of New York*, 2016 U.S. Dist. LEXIS 58860 (S.D.N.Y. May 3, 2016) (a false arrest claim under

19

New York state law requires the personal involvement of a defendant though direct participation or helping or ordering others to do unlawful acts). Here, the undisputed facts establish that Nurse Bjorck did not personally conduct the body cavity search but was merely present when it occurred. Nurse Bjorck's sole involvement was to direct that plaintiff needed to remove her clothing in order to be searched and to hand plaintiff "after care" instructions. Nurse Bjorck was not in a supervisory position, nor was she aware of any unconstitutional conduct which she could prevent. Thus, even if plaintiff's unlawful search claims were viable, the claim against Nurse Bjorck cannot succeed because there was no personal involvement on her part. *See Ma'at El. v. Doe*, 2016 U.S. Dist. LEXIS 146795 (E.D.N.Y. Oct. 24, 2016) (where officer was neither present or involved in the actual arrest but, upon advisement by another officer of the arrest, entered it into the online booking report, he was not liable for the false arrest).

### b. *Aggravation of Existing Medical Conditions*

Plaintiff makes a claim that the scope of the body cavity search was unreasonably dangerous, and that it caused her to suffer serious complications of her pre-existing medical condition. She asserts that the x-ray and manual search of her vaginal cavity exacerbated uterine bleeding related to fibroids and caused her to need a hysterectomy procedure. But, plaintiff provides no medical evidence or expert opinion linking the x-ray or cavity search to her subsequent hysterectomy. To refute plaintiff's allegation, Dr. Waldman submits the expert declarations of David E. Baum, M.D. which opines that because "there was no manipulation of the uterus, fibroids on the uterus, or the ovaries," plaintiff "could not have been exposed to any injury to any anatomical structures as a result of this examination." (Dkt. No. 107-10, ¶ 31; 123-6, ¶ 43). Dr. Baum concludes that

"there is no way that [plaintiff] would have to undergo a hysterectomy as a result of Dr. Waldman's search." (Dkt. No. 107-10; ¶ 33). The Court sees no merit to plaintiff's claims that the body cavity search caused or aggravated her medical conditions.

Accordingly, the Court finds that plaintiffs claims under the Fourth Amendment should be dismissed.

## II.     Plaintiff's Fourteenth Amendment Claims

### 1. *Violation of Agency Policy*

Plaintiff claims that defendants violated state regulations and denied her due process rights by not giving her the opportunity to refuse a search and depart without entry to Elmira Correctional Facility. She asserts that officers did not comply with New York regulations which provide that "[a]ny visitor who exercises his or her option to refuse to comply with the required search procedures shall not be permitted to enter a correctional facility." 7 NYCRR § 200.2(a).

Plaintiff's argument fails for two reasons. First, the referenced regulation relates to administrative search procedures which protect safety and security within correctional facilities. Administrative search regimes such as this permit government intrusion on personal privacy without individualized suspicion or the need for a warrant in certain instances reasonably justified by the public interest. *See Camara v. Municipal Court of San Francisco*, 387 U.S. 523 (1967). Legitimate administrate searches must be clearly necessary to a vital governmental interest; must be limited and no more intrusive than necessary to protect against the danger to be avoided, but nevertheless reasonably effective to discover the materials sought; and must be conducted for a purpose other than the gathering of evidence for criminal purposes. *See McMorris v. Alioto*, 567 F.2d

897, 899 (9th Cir. 1978) (citations omitted). Unlike a routine, administrative search governed under 7 NYCRR § 200.2, the events here occurred because of a criminal investigation of drug smuggling at Elmira. Plaintiff was detained based on probable cause and for the purpose of gathering evidence of the suspected crime. Thus, plaintiff was not stopped as a part of routine search procedures and defendants' conduct was not in conflict with the applicable regulations.

Moreover, federal constitutional standards rather than state law define the requirements of procedural due process. *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990). A state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983. *See Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985). Plaintiff makes the unsustainable argument that the violation of a DOCCS directive and New York state regulation alone amounts to a constitutional violation. Even if defendants failed to adhere to that state policy or regulations, plaintiff cannot sustain a federal claim without showing that a constitutional injury occurred. *See Joseph v. Marche*, 2019 U.S. Dist. LEXIS 40550, *12 (W.D.N.Y. Mar. 13, 2019) (Geraci, J.) ("To the extent that Plaintiff is arguing that Defendants' actions violated DOCCS's own policies, directives, or regulations, or otherwise violated state law, even if true, such a claim does not constitute a deprivation of Plaintiff's federal due process rights."); *see also Lopez v. Reynolds*, 998 F.Supp. 252, 259 (W.D.N.Y. 1997).

### 2. *Conditions of Confinement*

Plaintiff asserts that she was subjected to unconstitutional conditions of confinement while temporarily detained at Elmira. She claims that she was held in a hot, unventilated room, and that defendants Feliciano and Nunez denied her food, water, and

access to a restroom, and subjected her to yelling and ridicule. A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Usual Punishments Clause of the Eighth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To prove a Section 1983 claim, the detainee must satisfy two prongs: "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' […] or "mental element prong"—showing that the officer acted with at least deliberate indifference to the challenged conditions." *Id.*

The objective prong of this analysis requires a showing that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to "physical and mental soundness." *Darnell,* 849 F.3d at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). There is no "static test" to determine whether a deprivation is sufficiently serious; instead, "the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995).

Here, plaintiff's claims of deprivation of food, water, and use of restroom do not amount to an unreasonable risk of serious damage to her health or soundness. Plaintiff asserts she was held for a period of about four and half hours. There is a dispute in the record as to whether plaintiff was offered food and water during this time. Defendants Feliciano and Nunez attest that plaintiff was offered such, but plaintiff states she requested food and water and does not recall being provided either. Plaintiff was told to wait after asking to use a restroom, and she asserts she was forced to urinate on herself

as a result. She also asserts that Nunez pushed a trash can towards her and told her to use it like an animal. She claims that Feliciano and Nunez laughed at her after urinating on herself and told her to clean up her mess. Defendants object to this version of events, asserting that they were following agency protocol to allow a detainee use of a bathroom only after a toilet could be inspected and water turned off to prevent destruction of evidence. They also state that she was not made to clean up the mess. Plaintiff testified that she had eaten breakfast before arriving at Elmira that morning, and that she had used a restroom at the jail prior to being detained by defendants.

Reviewing the facts in a light most favorable to plaintiff, the events that occurred and the conditions of plaintiff's confinement were not unconstitutional. A deprivation of food and bathroom breaks over a relatively brief, finite period of time fails to rise to a level sufficient to sustain a due process claim. *See e.g. Amberslie v. Prisoner Transp. Serv. Of Am.*, LLC, 2019 U.S. Dist. LEXIS 33846, *2-3, 31-33 (N.D.N.Y. Mar. 4, 2019) (holding that denial of a restroom for up to seven hours, resulting in detainee having to use a water bottle to relieve himself, along with not receiving three meals a day during a multi-day prisoner transport trip was not unconstitutional); *Felmine v. City of New York*, 2011 U.S. Dist. LEXIS 111553, *63-66 (E.D.N.Y. Sept. 29, 2011) (finding that deprivation of food and water over as long as a day and a half, and being kept overnight in a cold cell without a mattress, was not a constitutional violation); *Jones v. Marshall*, 2010 U.S. Dist. LEXIS 3608, *9-10 (S.D.N.Y. Jan. 18, 2010) (finding no constitutional violation where detainee was denied the right to use a bathroom for approximately 90 minutes); *Dzwonczyk v. Syracuse City Police Dept.*, 710 F. Supp. 2d 248, 269 (N.D.N.Y. 2008) (ruling that denying detainee food and drink from time of arrest at 5:35 p.m. until the following morning did not

establish a violation of due process rights); *accord Rush v. Astacio*, 1998 U.S. App. LEXIS 18588, *5 (2d Cir. 1998) ("There are legitimate governmental purposes that justify not feeding every detainee upon arrival at a police station and that justify not accommodating every detainee's climate-sensitivities.")

Here, plaintiff's length of detention at Elmira did not exceed five hours. The deprivations she faced during that time were not sufficiently serious, and no condition or combination of conditions caused unreasonable risk to plaintiff's health during the brief period. Plaintiff's claims do not meet the objective prong of inquiry into her unconstitutional conditions of confinement claim. Thus, the Court need not analyze the second, mental element prong of the test.

Accordingly, the Court finds that plaintiff's claims under the Fourteenth Amendment should be dismissed.

### III.    Qualified Immunity

For the reasons just stated, the Court concludes that plaintiff has failed to establish that her right to be free of unreasonable search and seizure nor her right to due process was denied during the events of July 24, 2010. The Court further finds that even if plaintiff could establish a violation of her rights under the Fourth or Fourteenth Amendment, her claims should still be dismissed because defendants are entitled to qualified immunity.

### 1. *Law Enforcement Defendants*

The Supreme Court has held that officials performing their daily tasks are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In the event of an established constitutional

violation, the court asks, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted…[i]f a reasonable officer could have believed that the challenged conduct was lawful at the time of the violation, then qualified immunity bars the claim." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004); *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) ("even where the law is clearly established and the scope of an official's conduct is clearly defined, the qualified immunity defense protects an official if it was objectively reasonable for him at the time of the challenged action to believe his acts were lawful").

Further, an officer is entitled to qualified immunity against a suit for false arrest if he can establish that he had "arguable probable cause" to arrest the plaintiff. *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013). Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. *Garcia v. Doe*, 779 F.3d 84, 92 (2d Cir. 2015) (citations omitted). As described in detail above, defendants Feliciano, Nunez, Fifield, Heppner, and Procopio acted reasonably and appropriately in detaining plaintiff based on probable cause to suspect her involvement in a drug trafficking conspiracy. Even if probable cause were determined to be lacking, arguable probable cause is certain based on the information officers had obtained through investigation of plaintiff and her alleged co-conspirators. Thus, defendants are entitled to qualified immunity on this claim.

In regard to the unconstitutional conditions of confinement claim, defendants are also entitled to qualified immunity. Defendants argue that the law applicable to constitutionally-protected conditions for pretrial detainees was unclear in 2010.

Assuming, *arguendo*, that the scope of the law here was undeveloped at the time of the events, the Court then must review whether it would be objectively reasonable for defendants to believe that their conduct was unlawful at the time. This Court determines that temporarily denying a suspect food, water, and use of a restroom for a period not exceeding five hours is objectively reasonable in light of an officer's interest in preventing destruction of evidence and general practicalities of transitory detainment. Thus, defendants are entitled to qualified immunity on this claim.

Accordingly, this Court finds that defendants Feliciano, Nunez, Fifield, Heppner, and Procopio are entitled to qualified immunity from all of plaintiff's claims against them.

2. *Medical Personnel Defendants*

Additionally, defendants Waldman and Bjorck are entitled to qualified immunity as private individuals and medical personnel acting pursuant to a facially valid search warrant. The Supreme Court has ruled that non-state actors can be entitled to the protections of qualified immunity when performing government duties. *See Filarski v. Delia*, 566 U.S. 377 (2012). In *Rodrigues v. Furtado*, the First Circuit addressed the availability of qualified immunity for medical personnel conducting a body cavity search after being presented with a warrant by law enforcement officers. 950 F.2d 805 (1st Cir. 1991). There, the Court ruled that a private physician sued under Section 1983 for conducting such a search was protected by qualified immunity. *Id.* It reasoned that "[w]here a private physician agrees to assist the police in search procedures which police cannot reasonably, hygienically or safely perform, the physician is entitled to no less protection that the police would be if they could reasonably perform the search." *Id.* at 815. Comparing the qualified immunity standard of a reasonable officer with what should

be expected of a private individual enlisted to assist law enforcement, a District Court explained, "the appropriate standard for gauging the objective reasonableness of a private defendant's belief is that of the reasonable private citizen in the defendant's position, rather than that of the reasonable law enforcement official." *See Mejia v. City of New York*, 119 F. Supp. 2d 232, 269-70 (E.D.N.Y. 2000).

Here, defendants had no duty to look behind an objectively reasonable and facially valid search warrant to determine whether it was based upon probable cause. *See Rodrigues*, 950 F.3d at 815 ("There is no duty imposed upon the physician to make inquiry of the officer regarding his basis for probable cause where the warrant is objectively facially valid."). No reasonable jury could conclude that it was objectively unreasonable for Dr. Waldman, or Nurse Bjorck, to perform a body cavity search on plaintiff under these circumstances. They were presented with a facially valid warrant which specified the manner of search to be conducted and directed that it be performed safely and hygienically by medical personnel. Further, defendants were aware that plaintiff had received the assistance and counsel of a public defender prior to the search.

Thus, this Court finds that defendants Waldman and Bjorck, to the extent they were individually involved, are entitled to qualified immunity from plaintiff's claims against them.

## IV. Eleventh Amendment Immunity

Plaintiff's complaint is silent as to whether defendants are sued in their individual or official capacities. From the course of proceedings, it can be inferred that the plaintiff's claims were intended to be against defendants in their individual capacities. *See Roberts v. New York*, 2015 U.S. Dist. LEXIS 34692, *6 (N.D.N.Y. March 20, 2015) (*citing Moore v. Harriman*, 272 F.3d 769, 772 (6th Cir. 2001). But, to the extent plaintiff is attempting to

file suit against the defendants in their official capacities, said claims are barred by sovereign immunity under the Eleventh Amendment. *See Hafer v. Melo,* 502 U.S. 21 (1991); *Ky. v. Graham*, 473 U.S. 159 (1985); *Rodriguez v. Weprin*, 116 F.3d 62 (2d Cir. 1997); *Ying Jing Gan v. City of New* York, 996 F.2d 522 (2d Cir. 1993).

## CONCLUSION

For the foregoing reasons, it is recommended that defendant Bjorck's motion for summary judgment be granted in its entirety (Dkt. No. 105), that defendant Waldman's motion for summary judgment be granted in its entirety (Dkt. No. 107), defendant Feliciano's, Fifield's, Heppner's, Nunez's, and Procopio's motion for summary judgment be granted in its entirety (Dkt. No. 109), plaintiff's motions for summary judgment be denied in their entirety (Dkt. Nos. 112, 113), and plaintiff's complaint be dismissed with prejudice.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Geraci, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Geraci. *Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See* Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).

*Finally, the parties are reminded that, pursuant to W.D.N.Y.  L.R.Civ.P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

DATED:    March 27, 2020
          Buffalo, New York

/s/ *Michael J. Roemer*
HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge